**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| BARRY LEVINE | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:20-cv-01128-O |
| v. | ) | |
| | ) | |
| AMERICAN MENSA, LTD. and | ) | |
| JOHN DOES 1-5 | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF BARRY LEVINE'S BRIEF IN SUPPORT OF HIS RESPONSE TO**
**DEFENDANT AMERICAN MENSA, LTD.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

UNDISPUTED FACTS ............................................................................................... 1

DISPUTED AND ADDITIONAL FACTS ................................................................. 2

THE DEFAMATORY STATEMENTS ..................................................................... 8

ARGUMENT ........................................................................................................... 10

    A.    Legal standard. ............................................................................... 12

           1.    The elements of defamation. .................................................. 13

           2.    The elements of qualified privilege. ....................................... 13

    B.    Malice is not an element of Mr. Levine's defamation claim, and in any case, there is evidence that Mensa officers knew their statements were false when they spoke. ........................................................................ 14

           1.    Malice is not an elements of Mr. Levine's defamation claim under Indiana law. .................................................................... 15

           2.    There is clear evidence of malice. ......................................... 17

    C.    Bakerink's communications to Lomas clearly had a defamatory implication. .................................................................................... 21

    D.    No qualified privilege applies to any of the defamatory statements. ................. 22

CONCLUSION & PRAYER .................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539 (Ind. Ct. App. 2015)............................20

*Beeching v. Levee*, 764 N.E.2d 669 (Ind. Ct. App. 2002)........................................................16, 17

*Browne v. Hearn*, No. 2:20-CV-196-JVB-APR, 2021 WL 1946372 (N.D. Ind.
     May 14, 2021)..........................................................................................................................18

*Cambridge Integrated Services Group, Inc. v. Concentra Integrated Services,
     Inc.*, 697 F.3d 248 (5th Cir. 2012) ........................................................................................12

*Carney v. Patino*, 114 N.E.3d 20 (Ind. Ct. App. 2018) .....................................................14, 25, 26

*Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind. 372 N.E.2d 1211 (Ind. App.
     Ct. 1978) .................................................................................................................................21

*Crescent Towing & Salvage Co., Inc. v. M/V Anax*, 40 F.3d 741 (5th Cir. 1994)........................14

*Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958 (Ind. Ct. App. 2001)..................................23

*Dugan v. Mittal Steel USA, Inc.*, 929 N.E.2d 184 (Ind. 2010)......................................................24

*Ellis v. Luxbury Hotels, Inc.*, 716 N.E.2d 359 (Ind. 1999) .........................................................23

*Howard County Sheriff's Dep't & Howard County 911 Communications v. Duke*,
     172 N.E.3d 1265 (Ind. Ct. App. 2021), *transfer denied sub nom. Howard
     County Sheriff v. Duke*, 175 N.E.3d 273 (Ind. 2021)............................................................13

*Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446 (Ind. 1999) ...........................15, 17

*LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co., Inc.*, No. 1:08-CV-243,
     2010 WL 2608342 (N.D. Ind. June 25, 2010) .................................................................16, 17

*Med. Informatics Eng'g, Inc. v. Orthopaedics Ne., P.C.*, 458 F. Supp. 2d 716
     (N.D. Ind. 2006)................................................................................................................13, 16

*Mourning v. Allison Transmission, Inc.*, 72 N.E.3d 482 (Ind. Ct. App. 2017).......................13, 16

*Murphy v. Andrews*, 609 Fed. Appx. 222 (5th Cir. 2015) ...........................................................22

*Owens v. Schoenberger*, 681 N.E.2d 760 (Ind. Ct. App. 1997)...................................................13

*Poyser v. Peerless*, 775 N.E.2d 1101 (Ind. Ct. App. 2002) (Baker, J., concurring)....................15

*Shine v. Loomis*, 836 N.E.2d 952 (Ind. Ct. App. 2005) ...................................................15

*Thompson v. Huntington*, 69 F. Supp. 2d 1071 (S.D. Ind. 1999) ..................................16

*Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.*, 920 F.3d 958 (5th Cir. 2019) ..........................................................................................................................12

*Weenig v. Wood*, 169 Ind. App. 413 (Ind. Ct. App. 1976)............................................24

*Wilkinson v. Sheets*, No. 3:19-CV-902-RLM, 2021 WL 5771218 (N.D. Ind. Dec. 6, 2021) ......................................................................................................................16

*Williams v. Tharp*, 914 N.E.2d 756 (Ind. 2009) .........................................................14

**Statutes and Constitutional Provisions**

IND. CODE ANN. § 35-45-10-1 *et seq.* (West 2022) ......................................................18

**Rules**

FED. R. CIV. P. 30 ...........................................................................................................6

FED. R. CIV. P. 56 .........................................................................................................12

Defendant American Mensa Ltd.'s ("Defendant") Motion for Summary Judgment, Dkt. 48 ("Def.'s MSJ"), and its Brief in Support, Dkt. 49 ("Def.'s MSJ Brief") of same misstate the elements of the defamation claim in this case, and seek judgment on a defense of qualified privilege where the material fact question of Defendant's officers' mental states is decidedly in issue. Therefore, Plaintiff Mr. Barry Levine ("Mr. Levine" or "Plaintiff"), by and through counsel, now files his Brief in Support of His Response to Defendant American Mensa, Ltd.'s Motion for Summary Judgment and would show the Court as follows.

## UNDISPUTED FACTS

Mr. Levine does not dispute the following factual claims made in Defendant's MSJ Brief, though he reserves the right to dispute these facts at trial.

(1) Mr. Levine was a member of American Mensa for thirty years up until 2008, when he was expelled from the organization. Mr. Levine objected to his expulsion from membership as unfair and unjustified.

(2) Since his expulsion in 2008, Mr. Levine has attended many of the yearly Mensa Annual Gatherings which occur in different cities across the United States.

(3) The events of this lawsuit relate primarily, but not exclusively, to the Mensa Annual Gathering that occurred at the JW Marriott Hotel in Indianapolis, Indiana in July 2018.

(4) During the week of July 4, 2018, Mr. Levine contends that authorized representatives of Mensa, including its Chairwoman LaRae Bakerink published statements, both written and oral, accusing Mr. Levine of "verbally abusing" multiple members, and of "stalking" and "harassing" a Mensa leader, staff and members during the 2018 AG.

(5) Mr. Levine alleges that to carry out a pre-meditated attempt to exclude him from the JW Marriott Hotel during the 2018 Annual Gathering, representatives of American Mensa orally

and in writing informed hotel management that Mr. Levine was harassing, verbally abusing and stalking Mensa members who were in attendance, including Chairwoman LaRae Bakerink.

(6) Mr. Levine claims that on September 10, 2018, Chairwoman Bakerink repeated the alleged false accusation of "stalking" on MensaConnect, an American Mensa internet forum restricted to American Mensa Committee Members (the Mensa board of directors) and director Trevor Mitchell only.

(7) Levine alleges that on or after July 3, 2018, Mensa, through Chairwoman Bakerink, intentionally repeated and republished the false charge of stalking by Levine to other members of American Mensa, including allegations of a repeated history of stalking by Levine.

(8) Levine claims the statements were false because he did not engage in any harassment or stalking of American Mensa members or any other J.W. Marriot guests. Levine also alleges the statements were defamatory per se because he was accused of a crime: stalking.

(9) Prior to the 2018 Annual Gathering Mr. Levine created a website at www.mensaiscorrupt.org, which has garnered scant attention from the public.

## DISPUTED AND ADDITIONAL FACTS

Mr. Levine does dispute all of the following facts, on the strength of the evidence cited herein:

(1) Mr. Levine disputes that he publicly expressed displeasure with his expulsion but rather confined his protests primarily to private communications to Mensa leadership and members. Deposition of Barry Neal Levine ("Levine Dep."), 266:11-23, App. 190.

(2) Mr. Levine has only filed one lawsuit against Mensa objecting to his expulsion from membership—this lawsuit was not filed in order to object to his expulsion. This is a matter of public record.

(3) Mr. Levine was not stalking Ms. Bakerink at the Annual Gathering. Deposition of LaRae Bakerink ("Bakerink Dep."), 112:24-113:3 ( "Q. …Do you contend that by this encounter, him walking past you and saying he wanted his membership back, he was stalking you?...A. I cannot say that, no."), 119:9-13 ("Q. By making that remark as he was on the sidewalk ["Oh, you smoke too"], do you consider that he was stalking you?...A. At that time, no.") App. 025-32; Declaration of Barry Levine ("Levine Decl.") ¶¶ 4-9, App. 002-5.

(4) Mr. Levine disputes that the publication of defamatory remarks by Mensa was limited to the time period during the Mensa 2018 AG in Indianapolis. As set forth below, the publication of both written and oral defamatory statements about him continued in two posts by Mensa Chair LaRae Bakerink on September 10, 2018 and September 16, 2018, and in private conversation with Mr. Ed Lomas in November of 2018, which Mr. Lomas then republished on the M-Pol website on April 25, 2019. Bakerink Dep. 268:7-275:17, and Exs. 13, 14, and 16, App. 086-93, App. 101-107, 119-120, 127-137.

(5) Ms. Bakerink's September 10 and 16 posts repeat her defamatory claims and were not only sent to an executive committee group of five individuals officers as Defendant claims. Def.'s MSJ Brief, pp. 14-15. These posts were sent to the entire American Mensa Committee. Deposition of Trevor Mitchell ("Mitchell Dep."), 189:13-25, App. 246 ("Q. And I want to ask about how widely this [Ex.13] was distributed….A. "It would have been twenty-one….To clarify, five elected officers, ten regional officers, four appointed officers, the ombudsmen and myself."); Bakerink Dep. 100:7-22, 219:11-221:3 (Q. And can you tell us where this message [Ex.13] was posted and who had access to it…? A. This would have been only accessible by the American Mensa Committee."), 221:17-222:17, App. 018, 071-74.

Mr. Levine also contends that the following facts, absent from Defendant's MSJ Brief, are true and material with respect to Defendant's MSJ:

(1) Prior to 2018 American Mensa had never had occasion to complain to a host hotel about Mr. Levine's presence. *See* Deposition of Paige Faulkner ("Faulkner Dep."), 43:8-24, App. 160; Mitchell Dep., 43:16-44:5, App. 229-230.

(2) Mr. Levine's presence at the 2018 Mensa Annual Gathering, similar to his presence at annual gatherings in previous years, was a "distraction" to Mensa leadership, who had more important matters to deal with. Bakerink Dep., 73:13-74:10, 112:24-113:11, 126:2-23, 148:4-9, App. 015-16, 025-26, 039, 051.

(3) During the 2018 Annual Gathering, Mr. Levine had only three chance encounters with Chairwoman Bakerink that formed the basis of the accusations made against Mr. Levine to the Marriott Hotel and the members of the American Mensa Committee. Levine Dep., 439:3-461:7, App. 192-214; Declaration of Barry Levine, ("Levine Decl.") ¶ 5, App. 002-3; Bakerink Dep. 191:6-192:7, App. 065-66.

(4) The only two remarks that Mr. Levine made to Chairwoman Bakerink on Tuesday July 3, 2018 were "I want my membership back" when he had a chance encounter with her while coming off an elevator in the lobby of the Hotel as Mr. Levine was checking in, and 2) later that same evening when Mr. Levine was walking on the sidewalk outside the Hotel and observed Ms. Bakerink smoking he said "Oh, and you smoke too." Bakerink Dep., 102:9-24 and 113:12-24, App. 020, 026; Levine Decl. ¶ 5, App. 002-3. The next day around noon Mr. Levine and Ms. Bakerink had their third, and final, chance encounter in the lobby of the Hotel (after she had declined to get on a hotel elevator where Mr Levine was already riding) when he merely stated to her "Just can't shake me, can you?" Bakerink Dep. 169:17-170:16, App. 060-61; Levine Decl. ¶ 7,

App. 004. Each of these encounters occurred in the public areas of the Hotel and were chance encounters. Bakerink Dep. 192:8-24, App. 066; Levine Decl. ¶¶ 4, 8, 9, App. 002, 004-5.

(5) Mr. Levine spoke to no other American Mensa members, as further demonstrated by the fact that, in the evening on Wednesday July 3, 2018, Ms. Bakerink posted a message on a Mensa website concerning her initial contact with Mr. Levine which she entitled "More Fun for the AG - Barry Levine has Arrived." Bakerink Dep. 122:1-126:23 and Exhibit 8, App. 035-39, 108-113. In response to this lighthearted message, an American Mensa member and regional vice president from Florida, Mr. Thomas Thomas, posted a reply in which he described that he had seen Mr. Levine at the Hotel, but that Mr. Levine walked right past Mr. Thomas and Mr. Levine did not speak to Mr. Thomas or even acknowledge his presence. Bakerink Dep., 139:14-141:18 and Ex. 8, App. 047-49, 108-113.

(6) Mr. Levine did not pose a threat to Ms. Bakerink or to any staff or member of Mensa, and he certainly did not admit this as Mensa asserts in its brief. Def.'s MSJ Brief, p. 16. As Ms. Faulkner explained to the hotel: "Typically, he just hangs out in the lobby trying to talk to people about his cause…" Faulkner Dep., 113:23-116:19 and Ex. 3, App. 165-168, 179. Mensa and Hotel witnesses all conceded that no one believed that Mr. Levine presented a physical threat, and no one from Mensa complained to the Hotel that Mr. Levine posed a physical threat to anyone. Bakerink Dep. 107:4-10 (Mr. Levine did not try to touch or have any physical contact with her.), 112:24-113:3, App. 23, 25-26, 164-165; Mitchell Dep. 112:23-114:1 ("Q. There was no complaint or accusation that Mr. Levine posed a physical threat to anyone, was there? A. Not that I'm aware of."), 115:4-9, 130:21-133:4, App. 237-240, 241-244; Faulkner Dep. 124:25-127:19, App. 169-172. This is confirmed by Mr. Stanley Shultz, the Director of Loss Prevention of the JW Marriott:

"Q. … was there any indication to the hotel that Mr. Levine posed a physical threat to anyone? A. To my knowledge, no." Deposition of Stanley Shultz ("Shultz Dep."), 125:10-17, App. 269.

(7) Moreover, the accusation against Mr. Levine in Ms. Paige Faulkner's early morning July 4th email of verbally abusing multiple members of was ***demonstrably false***, *inter alia*, because at the time that this written accusation was made Mr. Levine had only had a random, chance encounter with *one* member of Mensa (Ms. Bakerink), not multiple members of the organization. Levine Decl., ¶¶ 5, 6, App. 002-4. Neither Ms. Faulkner, the author of the accusatory email, nor the Mensa Chair Ms. Bakerink, nor Executive Director Mitchell, who was also the Rule 30(b)(6) corporate representative of Mensa, could identify any other person with whom Mr. Levine had contact at the time the accusations were made in this email. Faulkner Dep., 124:1-24, and Ex. 9, App. 169, 181; Bakerink Dep., 155:10-156:14, App. 053-54; Mitchell Dep., 98:13-100:5, and Ex. 9, App. 234-236. Thus, by defendant's own admission, it is unable to provide any evidence to support the truth of the allegation that Mr. Levine was verbally abusing *multiple* members. Bakerink Dep., 161:13-24, App. 057 ("Q. You cannot provide us with any evidence to show that was accurate; can you? A….No[.]") Mitchell Dep., 98:13-100:5, App. 234-236; *see also*, Deposition of Lisette Woloszyk ("Woloszyk Dep."), 50:14-56:19, App. 280-286.

(8) Nevertheless, two representatives of the Hotel, including a Loss Prevention Department officer, went to Mr. Levine's room on July 4th to notify him that he had been accused of harassing Mensa staff and warning him that he would be evicted from the Hotel if Mensa made any further complaints against him. Deposition of Michael Coleman ("Coleman Dep."), 9:19-11:23, App. 147-149; Shultz Dep. 54:12-57:18, Exs. 8 and 9, App. 264-267, 273-274 (July 4, 2018 email from Robert Lynam, Front Desk Manager). In a contemporaneous internal email circulated among Marriott Hotel employees, one of the Hotel managers confirmed that "[a]fter giving Mr. Levine in

2929 his one and only warning to stop harassing the Mensa staff, we made it clear that he would be evicted if there were any further complaints[.]" Lynam Dep. Ex. 9.[1]

(9) On the following day in a meeting of the American Mensa Committee", (hereinafter "AMC" or "Committee") members of the Committee falsely accused Mr. Levine of "stalking" Chair Bakerink. Bakerink Dep. 193:21-194:25; 221:17-224:14, App. 067-68, 073-76. This July 5, 2018 American Mensa discussion and false accusation of "stalking" against Mr. Levine was subsequently confirmed *and repeated in writing* by Chair Bakerink. Thus, in a September 10, 2018 message to AMC members posted by Chair Bakerink on the MensaConnect internet website she stated "As we discussed during our meeting in Indianapolis, Barry Levine was stalking me during the AG." Bakerink Dep., 99:24-101:7, 219:11-222:17, Ex. 13, App. 017-19, 071-74, 101-102. The "meeting in Indianapolis" referred to in this September 10, 2018, post by Chairwoman Bakerink was the meeting of the AMC during the July 2018 Annual Gathering in Indianapolis. Bakerink Dep., 222:18-223:4, App. 074-75.

(10) Two weeks after the Annual Gathering, on July 20, 2018, counsel for Mensa, Mr. Clifton McCann, sent a demand letter to Mr. Levine setting forth a false narrative concerning Mr. Levine's conduct during the 2018 Annual Gathering and again accusing Mr. Levine of "stalking" Chair Bakerink during the Annual Gathering. Bakerink Dep., 209:11-20, Ex. 12, App. 069, 098-100.

(11) When Mr. Levine responded within the Mensa community to the accusations in this letter, Chair Bakerink published the accusatory letter to all members of the AMC throughout the country and urged them to use the accusations against Mr. Levine contained in the attorney's letter

---

[1] A final transcript of Mr. Lynam's deposition is not yet available. Pursuant to this Court's order at Dkt. 46, Mr. Levine will supplement this Response with the relevant excerpts and/or exhibit from Mr. Lynam's deposition behind a brief letter explaining the relevance of these materials.

when discussing Mr. Levine with the American Mensa membership at large. Bakerink Dep., 252:7-25; 254:4- 257:12, Ex. 14, App. 079, 081-84, 103-107.

(12) Mensa concedes that after the 2018 Annual Gathering, the members of the American Mensa Committee had no role in investigating or otherwise dealing with conduct by Mr. Levine. Mitchell Dep. 188:22-189:12, App. 245-246; Bakerink Dep. 225:12-226:8, App. 077-78.

## THE DEFAMATORY STATEMENTS

For the Court's convenience, Mr. Levine reproduces each defamatory statement of which he is aware here, with documentary support for each:

(1) June 27, 2018 email by Ms. Paige Faulkner (American Mensa National Meeting and Events Planner) to the Indianapolis Marriott Hotel:

> I wanted to alert you of a person that is *personae non gratae* at the American Mensa Annual Gathering as he has been removed from membership. You will probably want to share this with your security team…. Mr. Levine has a room booked at the JW July 3-8. Typically, he just hangs out in the lobby trying to talk to people about his cause but wanted you to be aware and know that he is PNG with us.

> *See* Faulkner Dep., pp. 47:15-49:20, and Ex. 3 to same, App. 161-163, 179.

(2) July 4, 2018 email by Ms. Paige Faulkner to the Indianapolis Marriott Hotel:

> Barry Levine, the ex-Mensa member that we alerted you too has arrived. I'm hearing that he's been verbally abusing some of our members and mainly our Chair LaRae Bakerink. Will you alert Loss Prevention just to give them a heads up?

> Faulkner Dep., pp. 113:23-116:19 and Ex. 9 to same, App. 165-168, 181.

(3) July 4, 2018 complaints by Mensa representatives to JW Marriott Hotel staff that Mr. Levine was "harassing" Mensa staff. Bakerink Dep. 189:12-15, App. 063 ("Q. And did you, in this meeting, did you use the word 'harassment'? Did you indicate you thought you were being

- 8 -

harassed? A. Yes, I believe I did."); Shultz Dep. 56:11-58:4 and Ex.9, App. 266-268, 274; Mensa Answers to Plaintiff's First Interrogatories, Nos. 8 and 9, App. 295-296.

(4) Repeated claims by American Mensa Committee members, including in a meeting on July 5, 2018, that Mr. Levine was "stalking" Ms. Bakerink. Bakerink Dep., pp. 193:21-194:25, 221:17-224:14, App. 067-68, 073-76 ("So you are saying as you sit here, during the executive session, the term 'stalking' was used to describe Mr. Levine's conduct. A. Yes, by one of the board members….Q. And did you endorse or agree with that characterization of Mr. Levine's conduct? A. Yes….Q. But you adopted that characterization in this post of September 10, 2018, didn't you? A. Yes, I did.").

(5) Ms. Bakerink's September 10, 2018 accusation in a post on the MensaConnect website, and a corresponding email to all members of the American Mensa Committee, that "As we discussed at our meeting in Indianapolis, Barry Levine was stalking me during the AG [Annual Gathering]." Bakerink Dep., 99:24-101:7, 219:12-222:17 and Ex. 13 to same, App. 017-19, 071-74. 101-102; Mitchell Dep. 78:21-80:13, App. 231-233.

(6) The publishing by Ms. Bakerink on September 16, 2018 of the McCann July 20, 2018 demand letter, originally sent to Mr. Levine, in which Ms. Bakerink again accused Mr. Levine of "stalking" her to the entire American Mensa Committee. Bakerink Dep. 252:7-24; 254:4-257:12, and Ex. 14 to same, App. 079, 081-84, 103-107.

(7) After a private dinner at her home in November 2018 during which Ms. Bakerink described to Mr. Ed Lomas the conduct of Mr. Levine during the 2018 Annual Gathering, on April 25,2019 Mr. Lomas posted the following statements on the M-Pol internet discussion forum:

> Mr. Lomas: "I heard LaRae's version of the event, and it isn't at all like Barry's version. She mentioned some incidents to me several months ago, and I believe that Barry was intentionally stalking and harassing her. …."

Mr. Levine: "So, the Chairman of American Mensa, LaRae Bakerink, asserted and convinced you , Ed, that I was "intentionally stalking" her. Thank you Ed for making that crystal clear."

Ed Lomas: "…**My belief is that you were stalking her, and it's based on what she [Bakerink]told me of your actions** and your lengthy story to explain a series of improbable events. …"

Bakerink Dep., 267:11-275 and Ex.16 to same, App. 085-93, 127-137.

(8) Mr. Lomas was a rank and file member of Mensa who held no office or position. These posts by Mr. Lomas were brought to the attention of Ms. Bakerink and she took no action to deny or correct the statements. Bakerink Dep. 273:10-275:17, App. 091-93.

## ARGUMENT

Defendant has not asserted a "no evidence" challenge on each and every element of Mr. Levine's claims. Defendant has not, for instance, challenged that the statements at issue are capable of defamatory meaning. Defendant has not challenged that the statements are false. Defendant has not challenged that the statements were "published" except with respect to the conversation between Ms. Bakerink and Mr. Lomas, about which Defendant contends there is no evidence of a defamatory statement having been made. Instead, Defendant has asserted three grounds for summary judgment. First, that Mr. Levine has no evidence to support "actual malice" as it relates to the defamatory statements at issue in this case. *See* Def.'s Mot., Dkt. 48, p. 1; Def.'s MSJ Brief, Dkt. 49, pp. 7-9. Second, that there is no evidence that any statements by Mensa officer LaRae Bakerink to Ed Lomas, which are evidenced by a later series of message board communications between Mr. Levine and Mr. Lomas, were defamatory. *See* Def.'s Mot., Dkt. 48, p. 1, Def.'s MSJ Brief, Dkt. 49, pp. 9-10. And third, that any statements by and between Mensa officers and the J.W. Marriot Hotel, and by Ms. Bakerink to the Mensa Committee were not defamatory (or that Mensa cannot be liable) due to the application of a qualified privilege. Def.'s Mot., Dkt. 48, p. 1, Def.'s MSJ Brief, Dkt. 49 pp. 11-16.

As the Court will see, the first argument fails because even if Indiana law applies—Mr. Levine accepts, for the purposes of this Motion, Defendant's choice of law analysis—actual malice is not an element of Mr. Levine's claim because Mr. Levine is not a public figure and the subject matter of the defamation does not relate to a matter of public concern. Consequently, while Mr. Levine does contend that evidence of actual malice—that is, of knowledge of untruth or reckless disregard for the truth—exists, none is necessary here, since actual malice is not an element of Mr. Levine's cause of action.

On the second issue, there is evidence, triable to a jury, that Ms. Bakerink's statements to Mr. Lomas are defamatory because statements may be defamatory by implication and must always be viewed in context. The fact that Mr. Lomas came away from his conversation with Ms. Bakerink—a conversation that happened after every other defamatory statement in this case, when Ms. Bakerink had already repeated her false claims of "harassment" and "stalking" to several others—with the impression that Mr. Levine was stalking her is strong circumstantial evidence that Ms. Bakerink's statements to Mr. Lomas either expressly or impliedly conveyed the defamatory implication.

On the third issue, Defendant attempts to conflate different uses of the word "threat" and different uses of the word "harassment" to attempt to justify defamatory claims that Mr. Levine was physical dangerous or a threat of criminal action when Defendant and its executives merely found him an annoying distraction. A qualified privilege—such as the one asserted, but not justified by case law, by Mensa with respect to its communications to the Marriott Hotel—based on protecting people from violence or criminal action, is simply inapplicable to defamatory statements regarding a person that Defendant's own witnesses testified they did not see as dangerous. *If* such a privilege exists at all for Mensa—since qualified privilege requires that both

sides of the communication be privileged—then under Indiana law *either* the statements breached any bounds of good faith by suggesting Mr. Levine was a physical or criminal threat when the deposition evidence establishes that Mensa witnesses did not believe him to be one, *or* the statements were not calibrated to their just purpose, and in either case the elements of Defendant's qualified privilege defense are not met.

The same issue vitiates any alleged privilege—also unsupported by applicable authority— that Ms. Bakerink had when she republished the accusation of "stalking" both in her September 10, 2018 post and in September 16, 2018 post conveying Mr. McCann's threatening letter of July 20, 2018 to Mr. Levine to the Mensa Committee via MensaConnect. Even if a privilege existed, Ms. Bakerink's accusations characterizing Mr. Levine as "stalking" or "harassing" her suggested that he posed a physical or criminal threat when she knew he did not, thereby either exceeding the scope of any privileged communication or violating the element of good faith.

In any case, the evidence of malice—that Ms. Bakerink and others intentionally exaggerated, knowing that Mr. Levine was not the threat they made him out to be—vitiates the application of any qualified privilege.

## A.    Legal standard.

A court may only grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is therefore entitled to judgment as a matter of law. FED. R. CIV. P. 56. In analyzing whether summary judgment is proper, a court must "construe all the evidence and reasonable inferences in the light most favorable to the nonmoving party." *Cambridge Integrated Services Group, Inc. v. Concentra Integrated Services, Inc.*, 697 F.3d 248, 253 (5th Cir. 2012). The nonmoving party's summary judgment evidence is assumed to be true. *Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 967 (5th Cir. 2019). Here, the nonmovant—and thus the party entitled to the indulgence of every reasonable inference and

the presumption of evidentiary truth—is Mr. Levine. This summary judgment standard is the framework within which this Court will consider the two other relevant legal standards in this case: the elements of defamation, and the elements of the affirmative defense of qualified privilege.

### 1.    The elements of defamation.

Defendant has argued, and for the purposes of this Response alone Mr. Levine will concede, that Indiana law applies to this case. Defendant is incorrect, for the reasons set forth in Section B., *infra*, to list malice as an element of Mr. Levine's defamation claim. In a case, like this one, involving a private plaintiff who is not a public figure suing over defamatory statements that do not implicate a matter of "public or general concern" malice is not an element of a defamation claim in Indiana. *Mourning v. Allison Transmission, Inc.*, 72 N.E.3d 482, 490 n.3 (Ind. Ct. App. 2017). Defendant does not, in its motion, challenge any other element of Mr. Levine's defamation claim, including whether the statements were made, whether they were published, whether they had  a defamatory imputation, and whether they caused damages.  Nor does Defendant challenge whether there is any evidence regarding whether the statements were made with negligence—the proper mental state under Indiana law where a non-public figure is defamed over a matter of less-than-general concern. *See Med. Informatics Eng'g, Inc. v. Orthopaedics Ne., P.C.*, 458 F. Supp. 2d 716, 721 n. 3 (N.D. Ind. 2006). Consequently, since no other element of Mr. Levine's cause of action is called into question, Mr. Levine will address only those elements which Defendant has challenged.

### 2.    The elements of qualified privilege.

Qualified privilege is an affirmative defense. *Owens v. Schoenberger*, 681 N.E.2d 760, 763 (Ind. Ct. App. 1997) (describing qualified privilege as an affirmative defense). Under Indiana law, a party seeking summary judgment in favor of an affirmative defense bears the burden of showing that the elements of its affirmative defense are "factually unchallenged." *Howard County Sheriff's*

*Dep't & Howard County 911 Communications v. Duke*, 172 N.E.3d 1265, 1272 (Ind. Ct. App. 2021), *transfer denied sub nom. Howard County Sheriff v. Duke*, 175 N.E.3d 273 (Ind. 2021) (noting that defendant moving for summary judgment on an affirmative defense had to show its affirmative defense was factually unchallenged). Under federal procedure the rule is similar—the party asserting the affirmative defense must establish each element of the defense as a matter of law to prevail on it at summary judgment. *Crescent Towing & Salvage Co., Inc. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994).

For this defense, Defendant bears the burden of initially establishing "in the first instance…the existence of a privileged occasion for the publication, by proof of a recognized public or private interests which would justify the utterance of the words." *Williams v. Tharp*, 914 N.E.2d 756, 762 (Ind. 2009). If—and only if—Defendant has first carried its burden to establish the existence of this defense, does it become Mr. Levine's obligation to negate the defense by showing that the privilege was abused, either by malice, or by showing that Defendant went "beyond the scope of the purposes for which the privilege exists." *Id.* This may happen because the speaker did not act with good will, because the publication was excessive, or because the statement was made "without grounds for belief in its truth." *Carney v. Patino*, 114 N.E.3d 20, 28 (Ind. Ct. App. 2018). And "[u]nless only one conclusion can be drawn from the evidence, the question of whether the privilege has been abused is for the jury." *Williams v. Tharp*, 914 N.E.2d 756, 762 (Ind. 2009) (quoting *Kelley v. Tanoos*, 865 N.E.2d 593, 601 (Ind. 2007)).

**B.    Malice is not an element of Mr. Levine's defamation claim, and in any case, there is evidence that Mensa officers knew their statements were false when they spoke.**

Defendant's argument that Mr. Levine cannot meet his burden on the element of malice in his cause of action is wrong twice; it is wrong in its premises, because malice is not an element of

Mr. Levine's cause of action, and it is wrong in its conclusion, because even if malice was an element of his claim, there is ample evidence of it.

1.      **Malice is not an elements of Mr. Levine's defamation claim under Indiana law.**

Defendant contends that malice is an element of every defamation claim under Indiana law, citing *Shine v. Loomis*. *See* Def.'s Br., p. 7, ¶ 14 and n. 27. This is incorrect. "Actual malice" is only required for a defamation claim in Indiana in two circumstances: (1) where the plaintiff is a public figure, or (2) where the subject matter of the defamation was a matter of public or general concern. *Shine v. Loomis*, 836 N.E.2d 952, 958 (Ind. Ct. App. 2005). This is made clear in the concurring opinion in *Poyser v. Peerless* (also cited by Defendants) in which Justice Baker analyzed the Indiana Supreme Court's case law regarding the proper mental state for a defamation claim and concluded that a majority of the Indiana Supreme Court (at that time) would hold that a defamation claim by a non-public figure about a non-public concern would only require proof of negligence as to publication. *Poyser v. Peerless*, 775 N.E.2d 1101, 1109 n. 3 (Ind. Ct. App. 2002) (Baker, J., concurring). That is, after all, what the Supreme Court of Indiana said in *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, in which the Indiana high court adopted the rule that the actual malice standard applies in cases involving "***matters of public or general concern*** for private individual plaintiffs." *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 452 (Ind. 1999) (emphasis added). The reference to matters of public or general concern would be pointless if the actual malice standard was to be applied in all situations. The Indiana Court of Appeals has since made this implication explicit:

> The parties proceed as if malice is a required element of Mourning's defamation claim; indeed, Mourning's complaint alleges malice. While private individuals must show actual malice when the communication in question relates to an issue of public concern, ***if the matter does not concern the public, then malice is not a required element.***

*Mourning v. Allison Transmission, Inc.*, 72 N.E.3d 482, 490 n. 3 (Ind. Ct. App. 2017) (emphasis added). In fact, the court in *Mourning* specifically noted "[i]t is not clear why the parties treat malice as a required element in this seemingly private matter." *Id.*[2]

Defendant makes no attempt—*none whatsoever*—to suggest that the defamatory statements related to a matter of public or general concern, or that Mr. Levine is any kind of public figure. They should not be afforded the opportunity to do that for the first time in their reply brief. In any case, it is clear that under Indiana law, Mr. Levine is not a public figure, nor are the defamatory statements at issue related to any matter of public concern. In *LDT Keller Farms*, for instance, the Northern District of Indiana determined that a publicly available advertisement placed by a private business that implied another business was selling sterile cows while advertising "heifers capable of milk production" did not address a matter of public concern and that thus the actual malice standard did not apply to the case under Indiana law. *LDT Keller Farms*, 2010 WL 2608342, at *6-7. The court explained: "the Farm World ad is simply the product of a business transaction between private parties that has devolved into a lawsuit[.]" *Id.* at *7. Similarly, in *Beeching v. Levee* the Indiana Court of Appeals determined that a school principal was not a public figure, and that the matter in dispute—employment-related claims that the principal was a liar who

---

[2] Indiana's federal courts agree. *Med. Informatics Eng'g, Inc. v. Orthopaedics Ne., P.C.*, 458 F. Supp. 2d 716, 721 (N.D. Ind. 2006) ("Actual malice, however, is required only when a public figure brings a defamation action or when a private individual brings a defamation action over a matter of public or general concern. In the case of a private individual bringing a defamation action over a matter of private concern, only negligence with regard to the truth or falsity of the statement is required.") (internal citations omitted); *Wilkinson v. Sheets*, No. 3:19-CV-902-RLM, 2021 WL 5771218, at *3 n. 1 (N.D. Ind. Dec. 6, 2021) ("Defamation only requires a showing of negligence for private plaintiffs in private matters."); *LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co., Inc.*, No. 1:08-CV-243, 2010 WL 2608342, at *4 (N.D. Ind. June 25, 2010) ("…in a matter of purely private concern, a private figure must only prove negligence with regard to the truth or falsity of the statement."); *see also Thompson v. Huntington*, 69 F. Supp. 2d 1071, 1077 (S.D. Ind. 1999) (discussing negligent defamation).

played favorites with employees—was not a matter of public concern. *Beeching v. Levee*, 764 N.E.2d 669, 676-80 (Ind. Ct. App. 2002). Because of this, the court found that the trial court had *erred* in applying the malice standard, since neither precondition—public figure or public concern—applied. *Id.* at 680. The court explained: "[t]here is no evidence in the record to suggest that [plaintiff] had achieved fame or notoriety" among the public, or that "the public was aware of the turmoil" at issue, or that the matter "ever garnered media attention[.]" *Id.* at 679-80.

This is a case in which a private person is suing a private organization with strict membership rules for making defamatory claims that he harassed or stalked a few private individuals in order to harangue them about a membership dispute. It is a private dispute that has "devolved into a lawsuit." *LDT Keller Farms*, 2010 WL 2608342, at *7. There is no evidence of public knowledge or interest in this matter, of general public notoriety on the part of Mr. Levine, or of any kind of public or media attention.[3] It is not the kind of dispute that involves the bedrock free political expression that justifies the imposition of a supernormal evidentiary burden in defamation cases. Mr. Levine is not a public figure, and this is not a matter of public concern; therefore *negligence*, rather than malice, is the required mental state in this case.

### 2.     There is clear evidence of malice.

Even were this not the case, however, there is more than enough evidence to reach a jury on the question of whether Mensa, through its officers, spoke with actual malice. In the law of defamation, "malice" is not ill-will, but conscious knowledge of falsity, or reckless disregard with respect to truth or falsity. *Bandido's*, 712 N.E.2d at 456. The argument that the defamatory statements in this case were made with malice is a simple one that proceeds in two steps: first, the

---

[3] The fact that Mr. Levine had a website on the internet on which he criticized Mensa, just like the public ad in the *LDT Keller Farms* case, does not make this private dispute a matter of public interest, especially since Mensa took the position that "publicly available web tracking sites indicate that your website is receiving little traffic." Bakerink Dep. 209:11-20 and Ex. 12.

defamatory statements directly imply that Mr. Levine was some kind of physical or criminal threat; second, *every single Mensa witness* who has testified on the subject admits he was not seen as such a threat—he was at most an annoyance or distraction. If both of those statements are true—if the statements imply that Mr. Levine was a physical or criminal threat, and if the defaming Mensa officers did not believe him to be one—then the defamers spoke with malice as that term is used in the law of defamation.

To the first point, do accusations of "stalking" and "harassment" imply a physical or criminal threat? They do. Indiana's criminal statutes specifically define "stalking" to involve a "knowing or an intentional course of conduct…that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." *See* IND. CODE ANN. § 35-45-10-1 *et seq.* (West 2022). One is not terrorized, frightened, or threatened by a mere distraction or annoyance—these are words that evoke a fear for one's physical safety. And it is in part because of laws like this that the colloquial usage of the word "stalking" has obtained a criminal, violent, and therefore defamatory veneer. And indeed, the Northern District of Indiana, interpreting Indiana law, has concluded that allegations of harassment, because of their implications regarding the crime of stalking, possess a defamatory meaning and may support a defamation claim. *Browne v. Hearn*, No. 2:20-CV-196-JVB-APR, 2021 WL 1946372, at *3 (N.D. Ind. May 14, 2021).

But the testimony of Mensa witnesses, reveal that none of them felt "terrorized," "frightened," or "intimidated' by Mr. Levine. Mitchell Dep. 112:23-114:1, 115:4-9, 130:21-133:20, App. 237-240, 241-244; Bakerink Dep. 112:24-113:3, 113:12-120:9, App. 025-33; Shultz Dep., 125:10-17, App. 269.

Instead, they felt annoyed, and didn't want Mr. Levine present because they felt he was disruptive and a distraction. *E.g.*, Bakerink Dep., 73:13-74:10; 126:2-23; 148:4-9, App. 015-16, 039, 051. None of them have testified to conduct by Mr. Levine that would *lead* a reasonable person to feel any of the emotional states engendered by the crime of stalking. The most Ms. Bakerink—the only person with whom Mr. Levine interacted—testifies to is a series of brief, chance and innocuous interactions in the public lobby at the AG, none of them more than a few words long. Levine Decl. ¶¶ 4-9, App. 002-5.

Ms. Bakerink's accusations of "stalking" *after* the AG are particularly problematic— during the AG it was always possible that she and Mr. Levine might have encountered one another again, or she might have learned something about encounters between Mr. Levine and other Mensa members, though certainly Ms. Bakerink had no reason to believe that Mr. Levine was any kind of threat. But *after* the AG Ms. Bakerink knew for certain just how limited her interactions with Mr. Levine were.  She knew, at that time, that nothing Mr. Levine had done during that event came close to constituting the kind of pervasive, obsessive, terror-inducing invigilation that would constitute stalking under any normal use of that term. That Ms. Bakerink admits Mr. Levine was not any kind of actual threat, yet uses language that would describe his conduct as a criminally violent act, is a perfect demonstration of knowledge of falsity (or at least reckless disregard for truth or falsity)—Ms. Bakerink *knew* her claims were false when she made them, or spoke without regard to the truth.  Ms. Bakerink's own communications with Mensa members imply that others had told her she was overreacting. Bakerink Dep., Ex. 13, App. 102 (suggesting she had been told she was being a "snowflake" and indicating a desire to ask presumably those same people how they would feel in her position).

And what about the other accusation—that Mr. Levine was "verbally abusing" people? This too was known to be false when said. At the time that Ms. Faulkner claimed that Mr. Levine had been "verbally abusing" multiple people, the testimony reveals that he had only spoken—and then only briefly—to Ms. Bakerink. Levine Decl., ¶¶ 5, 6, App. 002-4; Faulkner Dep., 124:1-24, and Ex. 9, App. 169, 180-181; Bakerink Dep., 155:10-156:14, 161:20-24, App. 053-54, 057; Mitchell Dep., 98:13-100:5, and Ex. 9, App. 234-236, 252-253.   The accounts of what was said hardly suggest anything like "verbal abuse," even taking Ms. Bakerink's testimony about it as true (which this Court may not, at summary judgment). Mr. Levine's testimony, which this Court is obliged to credit at this stage of the litigation, shows that the exchanges were chance and innocuous, and certainly not abusive. Levine Decl. ¶¶ 4-9, App. 002-5. And if the question in the Court's mind is Ms. Bakerink's mental state, then under Indiana law, that question must be reserved for the jury. *Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 548 (Ind. Ct. App. 2015) ("It is well settled, however, that summary judgment must be denied if the resolution hinges upon state of mind, credibility of the witnesses, or the weight of the testimony.") (internal quotations omitted).

So either Ms. Bakerink described the interaction to Ms. Faulkner as verbally abusive when it was not, or Ms. Faulkner herself decided to call the interaction verbally abusive when recounting it to the Marriott staff. In the former case, Ms. Bakerink spoke with knowledge of falsity; in the latter case, Ms. Faulkner grossly exaggerated, in reckless disregard of the truth or falsity of her statement. Either case involves malice.

Also "malicious" (as that word is used in defamation) is the exaggeration of the number of people Mr. Levine had spoken to. As noted, when Ms. Faulkner spoke she only knew of one person Mr. Levine had spoken to (because he had only spoken to one person). Consequently, exaggerating

that Mr. Levine had "verbally abus[ed]" multiple people was at least done with reckless disregard for the truth, if not outright knowledge of falsity. In either case, the statement was malicious.

Malice is not an element of Mr. Levine's cause of action, for the reasons given. However, *even if it was*, the evidence is clear: Defendant knew that Mr. Levine was at most a distraction who was annoying a very small set of people, yet they branded him as a stalking, abusive, harasser attacking the broader Mensa membership. Defendant's officers spoke with malice, as that term is used in the law of defamation.

**C.    Bakerink's communications to Lomas clearly had a defamatory implication.**

Defendant contends that there is "no evidence" that Ms. Bakerink, when speaking to Mr. Ed Lomas about Mr. Levine's conduct during the Annual Gathering, were defamatory, or that she used the words "stalking" or "harassment" when talking to him. However, given that Ms. Bakerink *herself* has repeatedly used the word "stalking" and "harassment" in other, prior communications, *see above*, it is a remarkable (unbelievable, even) coincidence that Mr. Lomas used that language if Ms. Bakerink did not. In any case, the specific *language* that Ms. Bakerink used in talking to Mr. Lomas is not what matters; what matters is whether her communications to him, in context, conveyed to him a defamatory implication. *Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind. 372 N.E.2d 1211, 1216 (Ind. App. Ct. 1978) (finding vague statements about "political connections" and about the defendant knowing "prominent local officials who can keep her son out of prison" constituted defamation when viewed in context, even though statements themselves did not make any literal claim of illegal activity). The context for the conversation with Mr. Lomas includes the previous statements about the interactions between Mr. Levine and Ms. Bakerink at the annual gathering. As Mr. Levine has already argued, the implication that Mr. Levine was stalking or harassing anyone is defamatory, and Indiana case law, also cited above, supports that proposition. After a conversation with Ms. Bakerink, Mr. Lomas came away with the impression

that Mr. Levine had been stalking and harassing Ms. Bakerink at the AG, a thing that Ms. Bakerink

and others had already alleged about Mr. Levine several times—after all, Mr. Lomas's statements

come *long* after Ms. Bakerink's original defamatory accusations in July and September of 2018.

Bakerink Dep. 221:17-224:14, Exs. 13 and 14, App. 073-76, 101-107. A jury *might* agree with

Defendant that Mr. Lomas came up with the words "stalking" and "harassing" on his own, but the

evidence is certainly sufficient for a jury to find the other way, and to find that Ms. Bakerink's

conversation with Mr. Lomas involved a republication of the same defamatory statements she had

already made several times. The question of whether one should credit Ms. Bakerink's testimony

that she did not venture the word "stalking" or similar accusations during her conversation with

Mr. Lomas, or whether one should side with the obvious inference that she continued to say what

she had said before, is for the jury to answer.  *Murphy v. Andrews*, 609 Fed. Appx. 222, 223 (5th

Cir. 2015) (credibility of testimony is the province of the jury).

**D.     No qualified privilege applies to any of the defamatory statements.**

As noted in Section A above, to prevail on its qualified privilege defense, Defendant bears

the original burden of establishing the existence of a proper occasion for its defamatory statements,

and a proper, recognized privilege. Defendant's entire qualified privilege argument is supported

by only a single legal citation which simply asserts that a communication may be privileged where

a party has a "public or private" duty, whether "legal, moral, or social" and the communication is

made to a person having a corresponding duty. *See* MSJ Brief, pp. 11-14.

Defendant's argument is twofold: first, that Mensa was privileged to tell the Marriott that

Mr. Levine was "verbally abusing," "stalking," or "harassing" people because Mensa and the

Marriott both have a duty to keep people safe. These "duties" are established by bald testimony—

even if this testimony was to be taken as true, which as evidence supporting the movant it should

not be, the fact that a person believes they have a legal, social, or moral duty does not mean that

the law agrees. There is some authority for the proposition that a hotel owes a duty of reasonable care to guests as business invitees, *Ellis v. Luxbury Hotels, Inc.*, 716 N.E.2d 359, 360 (Ind. 1999), but Mr. Levine has located no authority—and Defendant has not cited any—supporting the existence of any special duty by and between a voluntary, private membership organization like Mensa and its members to secure their safety at social events sponsored by the organization.

Second, Defendant claims that a similar duty existed on its officer's part to inform its own executive committee of potential legal issues. As noted above, this assertion of the limited audience of just the executive committee is factually incorrect. The discussion of "stalking" during the American Mensa Committee Meeting on July 5, 2018, the subsequent posts by Ms. Bakerink on September 10 and 16, 2018 were not limited to the five executive committee members, but rather were sent wholesale to the entire American Mensa Committee. And Ms. Bakerink has conceded that the members of this committee had no role in investigating or otherwise dealing with Mr. Levine. A statement, even one for a privileged purpose, loses its privilege if the publication is excessive—that is, it exceeds what is required by the asserted privilege. *See Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 969 (Ind. Ct. App. 2001) (reversing trial court summary judgment and finding fact issue where evidence wasn't clear on whether one hearer of the purportedly privileged statement had duty to be present and thus to hear the privileged report due to potential for excessive publication). Here, Defendant alleges a privilege for communicating legal issues to the five-member executive committee to defend a publication that was made to a 21-member committee that included numerous people who, by all accounts, had no duties with respect to Mr. Levine. Such a publication is clearly excessive and not protected, but even if there is some dispute over whether the additional sixteen members needed to hear Ms. Bakerink's claims, such a fact issue would be left for the jury in Indiana. *Dietz*, 754 N.E.2d at 969.

- 23 -

Defendant cites some authority for the proposition that intra-company statements regarding theft of intra-company property might support a qualified privilege defense. In *Dugan v. Mittal Steel USA, Inc.* the Indiana Supreme Court held that statements about a possible theft ring implicating company property were subject to a qualified privilege where the statements were made to the company's security personnel. 929 N.E.2d 184 (Ind. 2010). It is not at all clear that the privilege which applies to "statement[s]…to assist in an internal investigation that result[s] in criminal charges" would apply to publishing letters that overstate harassment and stalking claims that do not appear to form the basis of any contemplated legal action to a large group of Mensa Committee members whose duties are neither legal nor investigational.

But *even if* these duties, baldly asserted and unsupported by applicable authority, actually existed, it is clear they were abused. After all, malice—in the form of making a statement without belief or grounds for belief in its truth—vitiates any qualified privilege. *Weenig v. Wood*, 169 Ind. App. 413, 438 (Ind. Ct. App. 1976) ("since there is no social advantage to the publication of a deliberate lie, the privilege is lost if the defendant does not believe what he says…recklessness is treated as equally inexcusable") (quoting secondary sources). For the reasons already given above, Ms. Bakerink and Ms. Faulkner *at least* consciously exaggerated the "threat" posed by Mr. Levine, speaking either with actual knowledge of falsity, or at least with reckless disregard for same.[4]

---

[4] Defendant also, in its MSJ Brief, contends that Mr. Levine has admitted he was some kind of "threat" to American Mensa, citing a section of Mr. Levine's deposition where he talked about his emails to each new head of Mensa restating his grievance at having been dismissed from Mensa and having demanded his membership back. Construction of these emails as an admission that Mr. Levine is a "threat" is a bit of sleight-of-hand, conflating two different versions of the word "threat." *See* Def.'s MSJ, Ex. 1, 311:5-313:15. First, Mr. Levine does not, in those emails or in that deposition testimony, admit to being any kind of "threat" to Ms. Bakerink or Mensa—in fact he indicates that he builds his case for renewed membership on the bedrock foundations of Mensa. The word "threat" does not appear. Second, Defendant appears to be relying on the vagueness of the word "threat" to cash out its truth here. Certainly, Mr. Levine intends to make his case in every forum available to him, and in that sense he is a "threat" to the goal of keeping him out of the

- 24 -

For the reasons already given, there is clear evidence that Defendant knew its words were false when they were spoken: Defendant's witnesses repeatedly admit that Mr. Levine was no more than an annoyance, yet Defendant's officers accused him of stalking and harassment.

Finally, any privilege may be vitiated by demonstrating that the relevant communication was not made in good faith or exceeded the scope of the privilege. In *Carney v. Patino* the Indiana Court of Appeals affirmed a trial court's ruling against a motion for "judgment on the evidence" asserting a qualified immunity defense where the moving defendant contended that there was no evidence he had abused a privilege to report potential criminal conduct to the police (unlike either of the privileges alleged by Defendant in this case, an actual privilege supported by case law). *Carney v. Patino*, 114 N.E.3d 20, 28 (Ind. Ct. App. 2018). That case involved the prior owner of a home removing his own property—major appliances—from a house while moving out; the new owner, the defendant, reported this conduct to the police and accused the prior owner of theft. *Id.* at 24-26. After a jury returned a verdict for the plaintiff, the defendant argued that the only evidence offered to defeat his qualified privilege defense was speculative evidence about his mental state. After noting that a mental state of malice or ill will can be demonstrated by circumstantial evidence, the court explained that, under Indiana law, "summary judgment must be denied if the resolution hinges upon state of mind, credibility of the witnesses, or the weight of the testimony." *Id.* at 28. In *Carney* the evidence of ill will and malice was inconsistency between what the defendant told the police and the actual chronology and some potentially racially charged statements made to the plaintiff's employer; here the evidence shows a systematic exaggeration of the threat posed by Mr. Levine, and the consistent use of criminal terms to describe decidedly non-

---

organization or a threat to undermine confidence in the leadership of Mensa. However, Mr. Levine is not, and Defendant's witnesses have repeatedly testified that he is not, any kind of physical or criminal threat.

criminal behavior—this exaggeration either exceeds the scope of a permissible statement given the privilege at issue, or demonstrates both subjective malice (in the sense of knowledge of falsity or reckless disregard for truth) and ill will. In any case, the evidence is not such that "only one conclusion can be drawn" from it. *See id.* (citing *Williams*, 914 N.E.2d at 762). Defendant's qualified privilege defense must therefore be presented to a jury, not decided as a matter of law.

## CONCLUSION & PRAYER

Defendant's Motion ultimately fails because the evidence establishes critical jury questions on precisely the matters that Defendant's Motion seeks to foreclose, most critically on the alleged mental state of various speakers, and on whether any privilege (if any ever existed) was exceeded. Defendant has its view. It is entitled to make that view plain at trial. But it cannot foreclose the question of malice, much less negligence—the standard that actually applies—given the evidence. For these reasons, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be in all respects denied.

Respectfully submitted this 12th day of April, 2022.

/s/ John P. Atkins___ ____
John P. Atkins
Texas Bar No. 24097326
Thompson Coburn LLP
2100 Ross Avenue, Suite 600
Dallas, Texas 75201
jatkins@thompsoncoburn.com
P: 972.629.7119-Office
F: 972.629.7171– Facsimile
M: 503.523.8247

/s/ Alan E. Lubel_____
Alan E. Lubel (Admitted Pro Hac Vice )
Georgia State Bar No. 460625
LAW OFFICE OF ALAN E. LUBEL
3475 Piedmont Road, Suite 1100
Atlanta, Georgia 30305
 (404) 917-1080 – Office
(404) 233-1943 – Facsimile
alubel@lubellaw.com

Attorneys For Plaintiff Mr. Barry Levine

## CERTIFICATE OF SERVICE

I certify that I have this day served a copy of the foregoing upon counsel in this case by electronically filing with the Clerk of Court using the CM/ECF system which will be electronically served on all counsel this 12th day of April 2021.

/s/John P. Atkins_____
John P. Atkins